UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Joyce E. Lambert,

Plaintiff,

v.

John E. Potter,
United States Postmaster General,

Defendant.

Civil File No. 00-2580 MJD/JSM

**PLAINTIFF'S STATEMENT OF THE CASE**

---

## INTRODUCTION

After fifteen years of service, having just been chosen for a high-level management development track, Joyce Lambert learned that she was being sent to a dead-end job and a man was taking her place. When she started looking for other open positions that were in line with her management development plan, her manager suddenly informed her that she would not be permitted to explore other options because she had never-before-alleged "performance problems." When Lambert complained about being treated differently than her male counterparts, her manager gave her an "unacceptable" performance rating. Lambert was then forced to take a demotion to a job six levels below her previous job. At trial, Lambert will seek a verdict for the discrimination, harassment and retaliation she suffered.

## FACTS LAMBERT INTENDS TO PROVE

Plaintiff Joyce Lambert ("Lambert") started working with the USPS in 1985. Lambert worked in a number of jobs throughout the country. Over the years, Lambert

rose through the management ranks to attain the EAS Level of 22, and worked as a Level -22 from December 1991 until May 2000, when the USPS forced Lambert into an EAS Level 16.

**Lambert's Job and Reporting Structure**

In January, 1995, Lambert accepted a position as Manager of Distribution Operations ("MDO") in downtown St. Paul. The facility is known as the St. Paul Processing and Distribution Center ("St. Paul P&DC"). As one of the MDOs, for most of the relevant time periods, Lambert reported to the Plant manager, the highest ranking individual at the St. Paul P&DC. Lambert had several direct reports, called "Supervisors of Distribution Operations." ("SDOs") Each SDO supervised a number of "craft" or union employees.

From 1985 through 1999, Lambert consistently received reviews and raises showing that she performed to expectations. She received numerous awards for her exceptional efforts and leadership skills, including financial awards.

In February or March, 1998, Lead Plant Manager Bill Wotczak contacted Lambert directly regarding nominating her for the "Advanced Leadership Program" ("ALP"). The ALP was developed by the USPS to train managers to replace those managers at higher level positions who would be retiring or leaving the organization.

When Lambert told Wotczak she was interested, he told her that Thon would prepare the paperwork for Lambert to sign. On March 3, 1998, Thon Lambert's ALP forms to District Manager Michele Purton. Included with that nomination, Thon provided a detailed competency-based needs assessment for Lambert. In the assessment, developed on or about March 3, 1998, Thon scored Lambert as meeting expectations or

outstanding in every applicable category. The track for professional advancement through the ALP is mapped out in a form called an Individual Development Plan ("IDP"). Thon, as Lambert's sponsor, was responsible to participate actively as a mentor and be involved in the IDP development and program assessment.

In October, 1998, Lambert accepted a temporary assignment (a "detail") to St. Louis, Missouri. In November 1998, Thon and Lambert signed a written agreement providing specific outcomes, activities, resources and target dates for Lambert's career development, stating, "We agree to this plan for development and commit to accomplish the outcomes described." Thon worked with Lambert to develop the plan and assessed Lambert's strengths in order to assist Lambert in meeting the objective of Lambert's promotion to Plant Manager. By November 1998, Lambert had already taken the detail in the Mid West Area In-plant support – the first of the four steps on the ALP road map. At the end of Lambert's detail in December, 1998, the approving official described Lambert's accomplishments as follows:

> *Joyce was a breath of fresh air for the department. Her field experience was brought to bear on areas problems with great foresight and tact. Joyce fit right into our group and was productive from day 1. Her contributions were many and will be sorely missed.*

Thon received this information.

While Lambert was working in the St. Louis MWA, Thon had concerns about the St. Paul. P&DC plant performance, telling the remaining MDOs that they had to pull themselves up by the "bootstraps." Lambert returned from St. Louis in the third week of January 1999. Upon her return, Lambert and the other MDOs met with Thon to discuss the updated plant-wide goals for fiscal year 1999.

St. Paul P&DC created the position of Lead MDO and filled that position with

Tim Vierling in March, 1999. Thon's intent was for Vierling to devote greater time and attention in working with the MDOs than her schedule would allow. On or about April 7, 1999, Thon held her mid year goal evaluations. Thon discussed with Lambert the plant-wide goals. While the numbers for the plant showed that the plant as a whole was not looking to meet expectations, failure to meet all of the plant-wide goals was not unusual for the St. Paul P&DC. Thon did not offer any individual criticism of Lambert or her individual performance. Having recently been selected by Thon and Wotczak for the ALP program, with the very detailed evaluation of Lambert's leadership strengths, Lambert believed that she was personally meeting Thon's expectations. Thon did not tell her otherwise. Thon used a blank goals form to discuss "thoughts" on the status of an item. Thon provided a blank goals sheet to Lambert, without providing any rating to Lambert. Thon did not follow USPS policy in how she conducted her mid-year reviews.

During the entire term of her employment in the St. Paul facility, Lambert was the only female MDO. Male managers routinely withheld pertinent information from her, but did not withhold information from male managers. When Lambert objected, she received responses like, "Oh c'mon Joyce, what is your problem?" Lambert was excluded from work activities with other MDOs and MDO meetings. Lambert was the only one excluded. When Lambert objected, a male MDO retorted, "poor baby, did you get your feelings hurt?" When Lambert first started at St. Paul P&DC, she was scheduled to work seven of the eight holiday weekends in the year. MDOs would override decisions made by Lambert without her knowledge, but did not override the decisions of male MDOs. Male managers would routinely berate females, belittling and questioning the competence of females, including Lambert, but not the males. Requests made by women

for FMLA and other accommodations regarding reproductive needs were routinely met with scorn and failure to timely respond.

Thon always appointed male MDOs to replace her as acting Plant Manager when she was absent. Beginning about March 15, 1999, newly appointed Lead MDO Vierling joined Thon and the male MDO's in treating Lambert differently and hostilely. He singled her out in staff meetings for embarrassment, based on her sex. For instance, Vierling gave directives to the MDOs by referring to them as "guys." On one occasion, without having heard any objection from Lambert, he singled her out telling her that she counted as a "guy," also. On another occasion he used a swear word and, without having heard any objection from Lambert, he singled her out – asking her if she was offended. He did not ask any of the "guys," if they were offended. Vierling made it clear that he did not simply see Lambert as an MDO, he took her sex into account when he spoke to the group.

With only a few weeks' exposure to Lambert and the other MDOs, Vierling also attributed "stereotypically" gendered characteristics to Lambert in describing his displeasure with Lambert's supervisory style. While he described the men as, "a very proactive-type MDO" and "prepared to do whatever he needed to do," and "extremely knowledgeable," "the manager who ran Tour 3," he described Lambert's supervisory style as not "tough" enough, "don't push hard enough" "not running the Tour on Tour 3, not taking responsibility and laying blame."

During this same time frame, Lambert had been selected to participate in an advanced leadership program with the Agency. In the week April 12, 1999, Lambert participated in a week long leadership workshop, to present a program entitled

"Improving the Workplace Climate." On April 21, 1999, Vierling told Lambert that she did not "push hard enough" on her direct reports, that he did not have confidence in her and, although it was a "subjective" decision that he had not taken the time to evaluate, he was sending Lambert to a lower-level position in the Bulk Mail Center ("BMC"). Vierling did not review any of Lambert's past favorable performance evaluations and acted only on his subjective "gut feeling." When Lambert told him his decision was discriminatory, and that he was derailing her career with this move, Vierling stated that "no one but you and I need to know why." No male MDO was required to take an assignment away from the St. Paul P&DC. Lambert found the above-described conduct unwelcome and offensive and objected to the conduct. The transfer to the BMC was to an EAS Level 20 position, a lower level assignment for Lambert. The transfer to BMC was inconsistent with Lambert's Individual Development Plan in her ALP program, which Thon approved.

Initially, moving Lambert to the BMC was not presented as a "detail." Lambert was simply told she was leaving St. Paul P & DC. After Lambert objected to the transfer, Vierling told Lambert that this was actually going to be a detail, that he "forgot" to tell her. The length of time for the "detail" violated USPS policy directives by purporting to extend to approximately 240 days. (A "detail" should last 90-120 days). Vierling apparently tried to make the assignment seem shorter by executing two consecutive detail orders to cover the time period. Terry Hjelmgren, the male MDO who replaced Lambert, stayed in Lambert's job for more than a year.

On April 28, 1999, Lambert tried to cure the impact of the transfer by asking Vierling for a detail more in line with her Individual Development Program. Vierling did

not object. Vierling gave Lambert permission to contact Rochelle Eastman, Minneapolis Post Master, to explore other options. After receiving permission from Vierling, Lambert contacted Michele Purton and Rochelle Eastman to seek out details in the area of customer service. She revealed her perception that she was being treated unfairly because of her sex and needed help to keep her career on the ALP track. Eastman told Lambert that she would not counsel her on whether to file an EEO complaint, but that she (Eastman) had filed an EEO complaint against the USPS when she believed she was being held back on the basis of her sex.

Both Thon and Thon's boss, Terry Arnold, were directly questioned by Eastman and/or Purton about "what was going on with Joyce." Thon and Arnold, angered that others knew Lambert was upset about how they treated her at the St. Paul P&DC, curtailed Lambert's ability to get a detail in customer service. Unbeknownst to Lambert, Thon told Eastman that she would not be, "available" for a detail because she had "performance problems." This statement prevented Eastman from assisting Lambert in obtaining a customer service position, a necessary step in Lambert's Individual Development Plan.

In May 1999, after Lambert's discussion with Eastman, Thon called Lambert into her office. She told Lambert that the customer service detail would not be coming through and berated Lambert for going outside the "chain of command" by talking to Eastman. Thon also berated Vierling for giving Lambert permission to speak with Eastman. She told Lambert that Arnold was angry that she had gone outside the chain of command and had called Thon to say so, directing Thon to make sure Lambert

understood the "chain of command." Thon told Lambert that she should welcome the move to the BMC as an opportunity, now referred to by Thon as a "detail."

On October 14, 1999, Thon received a request for an affidavit of facts in response to Lambert's EEO charge. Eight days later, Thon recommended Lambert for an "unacceptable" merit rating. The unacceptable merit rating affected Lambert's pay, as those with an "unacceptable" do not receive merit compensation. USPS procedures state that an evaluating manager, "must request from each EAS employee a completed narrative of work accomplishments." As a custom and practice as Plant Manager, Thon would read the narrative of work accomplishments and take the narrative into consideration in evaluating an MDO. From 1996 – 1998, Thon asked for Lambert's narrative of work accomplishments and considered the narrative in evaluating Lambert. Each time, she found that Lambert had met expectations.

In 1999, Thon sought and received the narrative of work accomplishments from the male MDOs at the St. Paul P & DC. Thon did not seek the narrative of work accomplishments for Lambert. Thon testified that she applied subjective and unwritten criteria in evaluating Lambert. She kept this criteria "in the back of her mind" and did not disclose this criteria to Lambert.

Because of the emotional anguish caused by Thon and Vierling, Lambert took a 12 week FMLA leave. In September 1999, when Lambert's twelve weeks of leave were nearly up, she was still officially assigned to the BMC. Even though Thon told Lambert that Vierling should receive documentation regarding her absence, Thon decided to pursue the FMLA leave matter herself. She felt it was "unfinished business." On September 8, 1999, Thon sent a letter to Lambert requesting medical documentation in

support of her leave. Thon had several more communications with Lambert demanding medical information. On October 20, 1999, Thon scheduled a fitness for duty examination, stating as a reason that Lambert had a "behavioral problem."

By her doctor's letter of September 30, 1999, Lambert requested to return to work to an area consistent with her work restrictions. Her doctor wrote:

> *Major Depressive Disorder, single episode - severe, DSMIV code 296.23, with a symptom pattern that shows features that parallel Post Traumatic Stress Disorder.*

By this letter and subsequent letters from Dr. Thomason, Lambert asked the USPS to place her in a postal location with a different environmental stimulus, (i.e. people, building, location). Her doctor told the USPS that any work environment that is very similar to the environment where Lambert last worked would be high risk for causing Lambert to have a psychological setback. In Dr. Thomason's January 13, 2000 letter, he stated that he had extreme concern about Lambert being assigned to the BMC. He stated that it was likely Lambert would mentally and emotionally decompensate if forced to work at the BMC. Thon placed Lambert AWOL status.

From September 30, 1999 through the date that the USPS placed Lambert on AWOL status, Lambert cooperated with every request for medical information and attended two different independent medical examinations request by the USPS, one with Dr. Jetzer, who specializes in occupational medicine, and one with the Agency's expert in psychology, Dr. John Rauenhorst. Dr. Rauenhorst agreed with the restrictions imposed by Dr. Thomason. The USPS, however, continued to insist that the Lambert violate her own doctor's restrictions and return to work at the BMC.

Lambert continued to request work at an assignment that did not violate her

restrictions. Unable to get any response except that she must violate her work restrictions or be placed on AWOL status, Lambert then tried to get back to work by appealing to the District Manager of the USPS Northland District. By letter delivered January 21, 2000, Lambert reiterated her request to meet with the District Manager and delivered documentation to explain the urgency of the situation. The District Manager failed to personally respond at all; Lambert merely received a message from the plant manager, Judy Thon, that he would not override her decision to place the Lambert in AWOL status.

As a last ditch effort to avoid being fired because she had been placed in AWOL status for refusing to place herself into a situation that would cause her emotional and psycholgical harm, Lambert contacted Joni Marshall, in USPS human resources. On January 26, 2000, Lambert spoke with Joni Marshall about getting back to work without success.

On March 2, 2000, Lambert met with Joni Marshall and Mike Brown, her attorney, to discuss the possible jobs into which she could transfer. Ms. Marshall provided Lambert a sheet of open jobs and Lambert the jobs for which she was qualified and were in close proximity to her home. Ms. Marshall asked Lambert for a copy of her Form 991 showing her qualifications for customer service jobs at higher than a level 16.

On April 28, 2000, without acknowledging Lambert's repeated efforts to cooperate, the USPS issued an ultimatum: take a job that violated Lambert's work restrictions, take a downgrade in rank and pay, or be fired.

On May 20, 2000, the day the demotion took effect, several jobs were available to transfer Lambert into that did not violate her work restrictions and were more comparable to her rank. The USPS did not need to demote Lambert all the way down to an EAS-16

in order to place her in a job that would accommodate her work restrictions. These jobs were open at the time that Lambert was demoted.

Lambert is still employed by the Agency Defendant and USPS, but has been down-graded to an EAS level-16. Defendant could have continued to pay Lambert what she was earning in her previous position, but decided instead to demote her pay to that of a level 16.

## LEGAL ISSUES

### I. DIFFERENTIAL TREATMENT CLAIM

Title VII of the Civil Rights Act of 1964 and the Minnesota Human Rights Act make it an unlawful employment practice for an employer to discriminate against any individual with respect to her compensation, terms, conditions or privileges of employment, because of such individual's sex. 42 U.S.C. §2000e-2(a)(1); Minn. Stat §363.03 Subd. 1 (Supp. 2002). Discrimination may be proved by any combination of direct and circumstantial evidence from which a jury may draw an inference of discrimination. *See, Desert Palace, Inc. v. Costa,* 539 U.S. 90 123 S. Ct. 2148 (2003).

A plaintiff can prove that she suffered discrimination affecting the compensation, terms, conditions and privileges of employment by proving she suffered adverse employment action because of her sex. Adverse employment action includes **any action which results in tangible change in job duties or working conditions**. *Manning v. Metropolitan Life Ins. Co., Inc.*, 127 F.3d 686, 692 (8th Cir. 1997). The Eighth Circuit has considered reprimands, **negative performance evaluations**, denial of employment privileges and "file papering" to be adverse employment actions. See, *Bassett v. City of Minneapolis*, 211 F.3d 1097, 1106 (8Th Cir. 2000).

The Eighth Circuit, in *Kim v. Nash Finch*, instructs that a series of acts taken for improper motive, i.e. retaliation or discrimination, should be taken together in analyzing whether adverse employment action has been taken. *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997). Lambert will prove the following actions were taken with discriminatory animus, proving that Thon's negative performance evaluation discriminatory: interfering with Lambert's ability to complete her ALP requirements by assigning her to the BMC; interfering with Lambert's ability to get a detail in customer service by untruthfully telling Postmaster Eastman that Lambert had "performance problems;" giving Lambert an "unacceptable" mid-year evaluation when she gave the male Tour 3 MDO a "meets expectations" for the same results; not requesting the narrative of work accomplishments from Lambert prior to the final evaluation as is required by the USPS policy, when she requested the narratives from all male MDO's; providing higher officials with a negative evaluation of Lambert and recommending an "unacceptable" year end evaluation – thus preventing Lambert from getting a merit raise; and constructively downgrading Lambert from an EAS level 22 position to an EAS level 16 position, resulting in loss of pay and ineligibility to complete the Advanced Leadership Program.

These actions were taken in stark contrast to the manner in which Defendant's male MDO's were treated, giving rise to an inference of discrimination.

## II. SEXUAL HARASSMENT CLAIM

Under Title VII, an employer may not discriminate in the terms and conditions of employment based upon sex. 42 U.S.C. §2000(e). Discrimination based upon sex includes sexual harassment. *Harris v. Forklift Systems, Inc.*, 114 S. Ct. 367 (1993). The

definition of what constitutes sexual harassment is the same whether the harasser is a co-worker or a supervisor. Title VII is violated when the workplace is permeated with conduct that it is sufficiently severe or pervasive so as to create a hostile or abusive working environment. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986); *Harris v. Forklift Systems, Inc.*, 114 S. Ct. 367 (1993). In determining whether the conduct meets this standard, a fact finder is to look at all of the circumstances, including whether a reasonable person would find the workplace abusive, as well as the victim's subjective perception. *Id.* at 21-23. The court should examine the frequency of the conduct; its severity; whether it is physically threatening or a mere offensive utterance and whether it unreasonably interferes with an employee's work performance. *Id.*

When an employee is harassed by a co-worker, the employer is liable for the harassment when it knows or should know of the harassment and fails to take timely and appropriate action to stop the harassment. *Hall v. Gus Construction Co.*, 842 F.2d 1010, 1016 (8th Cir. 1988). When an employee is harassed by supervisory personnel, an employer's liability differs depending on whether the harassment was accompanied by, or followed by, adverse employment action. When harassment is accompanied by tangible employment action, an employer is held strictly liable. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 764-65 (1998). When harassment is not accompanied by tangible employment action, an employer is held liable when it fails to take timely and appropriate action to stop the harassment, unless it can show that it took reasonable steps to prevent and learn about harassment and the plaintiff failed to utilized complaint processes available for reporting harassment. *Id*. As discussed above, a negative employment evaluation can be an adverse action. A constructive demotion is also an adverse

employment action. *See, Fenney v. Dakota, Minnesota & Eastern Railroad Co.*, 327 F.3d 707 (8th Cir. 2003).

Over the course of four years, Lambert was subjected to an environment hostile to women. The harassment was severe and pervasive and affected the highest levels of management at the St. Paul P&DC. Management actively undermined Lambert's authority by overriding her decisions, but not overriding the decisions of her male peers. Lambert witnessed sexual play between her male peers and the women who worked for them. This conduct was unwelcome and Lambert objected to the behavior contemporaneously. The harassment affected Lambert's work hours, a term of her employment. The harassment affected the condition of her employment. Every day Lambert struggled to maintain credibility with those who worked for her, as some of her male peers undermined that authority. Lambert's EEO affidavit provides 22 pages of examples over the four year period.

In a survey of work place climate, Lambert reported that the St. Paul P&DC was a sexually hostile environment. Thus, managers at the highest level knew that Lambert had complaints about sexual harassment, yet no one approached her to investigate her allegations. The USPS did not take timely and appropriate steps to deal with the hostile environment.

From the day Vierling came to St. Paul P & DC , he singled out Lambert because of her gender, patronizing her regarding the use of the term "guy" and treating her as if her "womanly feelings" would be hurt by hearing a cuss word. He criticized her supervisory style, as "weak" without foundation. For the few weeks that Vierling was at the St. Paul P&DC before he took action to move Lambert, Vierling's treatment of

Lambert was permeated with discriminatory intimidation, ridicule and insult. In addition to her "reports" in 1995, Lambert spoke to Michele Purton, Rochelle Eastman and Judith Thon about Vierling's behavior. Lambert even asked Purton to intervene in her work issues. Purton did not respond. Lambert sent two letters to Wayne Rogers, who also ignored Lambert's pleas.

**REPRISAL / RETALIATION**

Title VII makes it unlawful for an employer to discriminate against an employee because she has opposed any practice made an unlawful practice under Title VII, or because she made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under Title VII. *See* 42 U.S.C. §2000e-3(a). A plaintiff establishes her retaliation claim by proving protected conduct, adverse action and a causal connection between the two. *See EEOC v. Kohler Co.*, 335 F.3d 766 (8th Cir. 2003). Making an EEO complaint of discrimination is protected conduct. See, 42 U.S.C. §2000e-3(a).

The evidence in this case will show that Lambert filed two internal EEO complaints, supported by a 22-page affidavit complaining of sex discrimination and a hostile environment for women in her workplace. She suffered adverse actions, including receiving a career-ending "Unacceptable" merit rating within two weeks after her manager received her EEO affidavit and being forced into a EAS Level 16 position—six levels below her MDO position. Negative performance evaluations that impact an employee's pay or future progression are adverse actions under Title VII. *See, Manning v. Metropolitan Life Ins. Co., Inc.*, 127 F.3d 686, 692 (8th Cir. 1997);*Bassett v. City of*

*Minneapolis*, 211 F.3d 1097, 1106 (8[Th] Cir. 2000); *Cross v. Cleaver*, 142 F.3d 1059, 1073 (8[th] Cir. 1998) citing *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8[th] Cir. 1997).

A constructive demotion is also an adverse employment action. *See Fenny v. Dakota, Minnesota & Eastern Railroad Compan*y, 327 F.3d 707, 718 (2003). A plaintiff may prove a constructive demotion by showing that a reasonable employee in her position would have believed that she had no choice other than to accept a demotion. *Id.*

Lambert will prove causation through evidence that the unacceptable merit rating came only days after Thon learned of Lambert's EEO complaint, and through evidence that Thon failed to follow USPS policy in conducting her performance review, and treated Lambert's review differently than she treated the review of any other manager. Further, Lambert will demonstrate causation by demonstrating that Thon prevented her from seeking a position in customer service within days of learning that Lambert had discussed her concerns of discrimination with Eastman, falsely accusing her of having performance problems. Lambert will further demonstrate causation by showing that Thon's accusation of her "performance problems" came within months of Thon herself signing Lambert's ALP plan and receiving the glowing assessment of Lambert's manager from her work in St. Louis.

## CONCLUSION

The evidence described herein will support a jury verdict in Lambert's favor.

Dated: July 19, 2004

s/Celeste E. Culberth
**CULBERTH, LIENEMANN & STRATTON, LLP**
Celeste E. Culberth 228187
Leslie L. Lienemann 230194
1050 Piper Jaffray Plaza
444 Cedar Street
St. Paul, MN 55101
(651) 290-9300

**ATTORNEYS FOR PLAINTIFF**